**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**AT PIKEVILLE**

**CIVIL ACTION NO. 21-88-DLB-EBA**

**BIG SANDY COMPANY, L.P.**                                                                                   **PLAINTIFF**

**v.**                               **MEMORANDUM OPINION AND ORDER**

**AMERICAN CARBON CORPORATION**                                                  **DEFENDANT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

This matter is before the Court upon Plaintiff Big Sandy Company, L.P. ("Big Sandy")'s Motion for Summary Judgment (Doc. # 46) and Motion to Exclude Expert Testimony of Bill Johnson (Doc. # 47). American Carbon Corporation ("ACC") has filed Responses (Docs. # 48 and 49), and Big Sandy has filed Replies (Docs. # 50 and 51). The Motions are now ripe for the Court's review. For the reasons stated herein, Plaintiff's Motion for Summary Judgment (Doc. # 46) and Motion to Exclude Expert Testimony (Doc. # 47) are **granted**.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

Big Sandy has owned coal interests in Pike County, Kentucky since the early 1900s, including several properties near the Bent Branch of Johns Creek. (Doc. # 46 at 2). Those properties include portions of the Millard, or Glamorgan, coal seam, made up of metallurgical quality coal. (*Id.*). In February 2003, Big Sandy entered into a lease with McCoy Elkhorn Coal Corporation, a subsidiary of James River Coal Company. (*Id.*). Big Sandy leased "all the mineable and merchantable coal that can be mined by the deep

1

mining method only in the seam of coal known as the Millard Seam," ("the Demised Coal") to McCoy Elkhorn.  (Doc. # 1 at ¶ 9).  McCoy Elkhorn constructed a mine complex designated as "Mine 15" and mined for several years, producing nearly 650,000 tons of coal each year.  (Doc. # 46 at 2).  Before the termination of the lease, James River and its subsidiaries entered bankruptcy.  (*Id.*).  A new company, Fortress, acquired the assets of McCoy Elkhorn, including the lease with Big Sandy, and operated under the McCoy Elkhorn name until it also declared bankruptcy in 2016.  (*Id.*).

ACC, formerly operating as Quest Energy Inc., made a bid to acquire Fortress's assets in its bankruptcy proceedings, including Mine 15 and the lease with Big Sandy.  (*Id.* at 4).  In its bid letter, ACC represented that "[t]here [were] no financial or due diligence contingencies associated with this bid."  (Doc. # 46-13 at 1).  On February 8, 2016, ACC's bid was accepted, and it formally acquired the assets including the lease with Big Sandy.  (Doc. # 46-14 at 58).

The lease required the leaseholder to (1) commence mining as soon as practicable and continue to diligently mine in an efficient, workmanlike, and proper manner (Doc. # 46-4 at § 3.2); (2) pay production royalties based on the weight of mined coal to Big Sandy, and if those amounts did not meet contractually required minimum royalties, pay a deficiency payment (*id.* at § 4.7); and (3) reimburse Big Sandy for certain tax payments (*id.* at § 3.16).  The lease also provided for interest on late payments in the amount of 1.5% per month from the date the payment was due (*id.* at § 4.11), and attorney's fees and costs associated with enforcing the rights under the lease (*id.* at § 3.17, 8.17).

Following the acquisition of the lease and Mine 15, ACC approached Big Sandy about a loan or capital investment to purchase equipment to reopen Mine 15.  (Doc. # 46

2

at 5). Big Sandy agreed to discuss a potential loan, and the parties exchanged proposals for Big Sandy to provide ACC with funds to purchase equipment to mine the coal, and restructure the minimum annual royalties provided in the lease. (*Id.* at 6). There was no formal written agreement to modify the contractual terms. (Doc. # 46 at 6; Doc. # 49 at 3).

The lease expired on February 1, 2021, and neither party disputes that ACC did not mine any coal during the five years that ACC held the lease. (Doc. # 46 at 9; Doc. # 49 at 3). Nor does either party dispute that ACC did not pay minimum annual royalties or deficiency payments, or tax reimbursements to Big Sandy. (Doc. # 46 at 10; Doc. # 49 at 6). Three months after the expiration of the lease on May 12, 2021, ACC sent an email to Big Sandy that notified Big Sandy that ACC believed the Demised Coal was not mineable or merchantable without a capital investment from Big Sandy, and it was therefore excused from its obligations under the lease. (Doc. # 46-26).

On October 25, 2021, Big Sandy filed suit in this Court alleging three counts of breach of contract, seeking pre-judgment and post-judgment interest, and attorneys' fees. Specifically, Big Sandy alleges that ACC breached (1) § 4.7 of the lease that required deficiency payments in lieu of minimum annual royalties in the amount of $1,092,257.23 for 2016-2021; (2) § 3.16 of the lease requiring reimbursement for unmined mineral taxes assessed by the Commonwealth of Kentucky for 2017, 2018, and 2019 in the amount of $9,928.23; and (3) § 3.2 of the lease that required ACC to "mine and produce the greatest amount of the Demised Coal that can be mined utilizing modern mining methods and coal cleaning machinery and equipment, all in a manner consistent with prudent mining practices." (Doc. # 1 at 4-6). Big Sandy also seeks the pre-judgment and post-judgment

interest on the amounts due, as well as attorney's fees and costs provided for in the lease. (*Id.* at 6).

Following the entry of the Scheduling Order (Doc. # 12), the parties proceeded with over a year of discovery that concluded on March 24, 2023. (Doc. # 45). On May 15, 2023, Big Sandy filed the instant Motion for Summary Judgment (Doc. # 46) and a Motoin to Exclude the Expert Testimony of Bill Johnson (Doc. # 47). ACC filed its Responses (Docs. # 48 and 49), and Big Sandy filed its Replies (Doc. # 50 and 51). For the reasons that follow, Big Sandy's Motion for Summary Judgment (Doc. # 46) will be **granted**.

## II.  ANALYSIS

### A.  Standard of Review

A motion for summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, no genuine dispute exists where *no* reasonable jury could return a verdict for the nonmoving party. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). The moving party bears the burden of showing the absence of a genuine issue of material fact. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). After that burden is met, to avoid the entry of summary judgment, the non-moving party must produce "specific facts" showing a "genuine issue" necessitating the matter moving forward to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). However, where applicable, the non-

4

moving party's rebuttal burden is light, as the Court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

  **B.**  **Choice of Law**

  A federal court sitting in diversity must apply the substantive law of the state in which it is sitting. *See Hanna v. Plumer*, 380 U.S. 460, 465-66 (1965) (explaining *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). This includes applying the choice-of-law rules of the state in which the court sits. *Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994). In contract cases, Kentucky law applies when Kentucky meets "the 'most significant contacts' test, set forth in § 188 of the Restatement (Second) of Conflict Laws." *Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971, 981 (E.D. Ky. 2016) (citing *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009)). When a contract includes a choice-of-law provision which governs its interpretation, the same test applies and "trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky." *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 574-75 (6th Cir. 2019) (quoting *Osborn v. Griffin*, 865 F.3d 417, 444 (6th Cir. 2017)); *see also Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707-10 (W.D. Ky. 2013). Here, the lease indicates that it "shall for all purposes be governed by and construed in accordance with the laws of the Commonwealth of Kentucky." (Doc. # 46-4 at § 8.11). And neither party raises a conflict of law issue in its briefing. Thus, there is no conflict of law at issue here, and Kentucky law will govern the analysis.

### C.  Big Sandy's Motion for Summary Judgment

Big Sandy argues that ACC breached the Lease by failing to (1) diligently mine the Demised Coal; (2) pay the required deficiency payments; and (3) reimburse Big Sandy for tax payments related to the Demised Coal. (Doc. # 46). Big Sandy argues it is entitled to summary judgment on ACC's failure to diligently mine the Demised Coal because (1) mineability and merchantability are objective inquiries under Kentucky law; (2) ACC did not utilize the alternative dispute process outlined in the lease to contest the mineability or merchantability of the Demised Coal; and (3) ACC is estopped from raising the claims about mineability or merchantability because of representations it made to the bankruptcy court in assuming the lease. (*Id.*).

With respect to the deficiency and tax payments, Big Sandy argues that while it agreed to a discussion about restructuring the payments, no agreement was reached that would have excused the payments. (*Id.*). Big Sandy also argues that because it prevails on the underlying claims, it is entitled to interest on the amounts due and attorney's fees, but a separate trial on damages will be necessary to determine how much it is owed for the diligent mining claim. (*Id.*).

In response, ACC argues that the Demised Coal was not mineable or merchantable without a large cash loan from Big Sandy. (Doc. # 49 at 4). ACC argues that whether the Demised Coal was mineable or merchantable "is an issue of fact that would make summary judgment improper," the market "was in great turmoil with fluctuating pricing," and the COVID-19 pandemic "basically made coal impossible to sell." (*Id.*) ACC further argues that damages are far from being resolved, which is another fact that weighs against the granting of summary judgment. (*Id.*) ACC argues that a March

6

7, 2017 email exchange provided notice that the coal was not mineable and merchantable, and formally altered ACC's obligation to pay Big Sandy the royalties and tax payments. (Doc. # 49 at 6, 7). ACC also argues that an oral agreement to modify a contract subject to the Statute of Frauds may act as a waiver excusing its performance, citing to the Restatement of Contracts and one Kentucky Appellate Court decision. (Doc. # 49 at 7) (quoting Restatement (Second) of Contracts § 150 (1981); *Seminary Woods, LLC v. Brown*, No. 2009-CA-1769-MR, 2011 WL 1196466, at *3 (Ky. Ct. App. Apr. 1, 2011)). ACC also argues that there were no cure claims when it assumed the lease after Fortress's bankruptcy, and prior lessees were excused from making these payments so ACC's performance should be forgiven as well. (*Id.*).

In its Reply, Big Sandy rejects ACC's argument that ACC and Big Sandy entered into an agreement to modify any of the terms of the lease. (Doc. # 50 at 6). Big Sandy argues there is no dispute of fact regarding whether there was a written agreement that modified the lease, as required by the lease and the Statute of Frauds. (*Id.*) (quoting Doc. # 46-6 at § 8.9; Doc. # 46-9 at 129:14-16). Big Sandy further argues that there was no waiver that would have excused the Statute of Frauds requirement here. (*Id.*). Finally, Big Sandy argues that its decision not to pursue remedies against former lessees is not relevant to the lease with ACC, as the lease contains non-waiver provisions that are acceptable under Kentucky law. (*Id.* at 9).

    **1.**    **Breach of the Lease**

In Kentucky, a breach of contract claim consists of (1) the existence of a contract; (2) a breach of that contract; and (3) damages flowing from the breach. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007). A lease is a

contract and is interpreted in accordance with "the plain language of the instrument." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). "'In the absence of ambiguity, a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 690, 687 (Ky. 2012) (quoting *Frear v. P.T.A. Indust., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)).

No dispute exists as to whether there is a valid contract in this case. (Doc. # 46 at 1; Doc. # 49 at 2). It does not appear that either party disputes that ACC breached the lease, either, as ACC states that it did not mine any of the Demised Coal or make the required deficiency or tax payments. (Doc. # 46 at 9-10; Doc. # 49 at 2-3, 6). Instead, ACC argues that its performance should be excused because it was not profitable to mine the Demised Coal without a capital investment from Big Sandy, and conversations to obtain that capital investment were ongoing. (Doc. # 49 at 2). Further, ACC believes the deficiency and tax payments were excused while these negotiations were occurring. (*Id.* at 6).

### a. Failure to Mine the Demised Coal

The lease required the leaseholder to "commence mining as soon as practicable and continue to diligently mine in an efficient, workmanlike, and proper manner." (Doc. # 46-4 at § 3.2). Big Sandy argues that this is a clear cut breach of the lease, as ACC admits that it did not mine any of the Demised Coal. (Doc. # 46 at 11) (quoting Doc. # 46-9 at 233-234). ACC's position is not that the coal was not physically mineable or

merchantable, but that the coal was not mineable or merchantable without a capital contribution from Big Sandy to restart the mine. (Doc. # 49 at 4).

However, as Big Sandy notes, whether the coal is mineable and merchantable is an objective inquiry under Kentucky law. (Doc. # 46 at 12) (quoting *Auxier Coal Co. v. Big Sandy & Miller's Creek Coal Co.*, 238 S.W. 189, 191 (Ky. 1922) and *Martin's Fork Coal Co. v. Harlan-Wallins Coal Corp.*, 14 F. Supp. 902, 907-08 (E.D. Ky. 1934)). In Kentucky, mineable coal is defined as "coal that could be profitably mined by judicious methods," *Auxier Coal Co.*, 238 S.W. at 191, or coal "that could be mined and sold at a profit under ordinary or average conditions." *Martin's Fork Coal Co.*, 14 F. Supp. at 908. Kentucky cases have also explicitly noted that a declining sale price is insufficient to render coal unmineable or unmerchantable. *See Laurence E. Tierney Land Co. v. Kingston-Pocahontas Coal Co.*, 43 S.W.2d 517, 522 (Ky. Ct. App. 1931) ("in the lease contract under discussion there was . . . no condition implied in law which would have relieved the lessee from payment of royalties because the mining of that seam could no longer be conducted at a profit due to falling prices . . . ."); *Hall v. Eversole's Adm'r, et. al*, 64 S.W.2d 891, 897 (Ky. Ct. App. 1933) (holding that a lessee could not escape their obligations to mine under the contract simply because they could not profitably mine the coal seam).

This means that whether ACC believed it was profitable for it to mine the Demised Coal is not relevant to whether the Demised Coal was mineable or merchantable. Further, ACC admitted in discovery that there were no physical conditions around the coal seam or problems with the coal itself that made the coal unmineable or unmerchantable. (Doc. # 46-15, at 3). ACC points to no provision in the lease that excused its obligation to

9

diligently mine the Demised Coal unless it would be unprofitable to do so. Instead, ACC argues generally that whether the coal was mineable or merchantable "raises an issue of fact which would make summary judgment proper" because "[q]uestions and issues regarding an 'objectively constructed economic model' for the mining of the Plaintiff's coal reserves are very much in dispute." (Doc. # 49 at 4). ACC argues that in the 2016-2021 timeframe, the market "was in great turmoil with fluctuating pricing, many large coal companies, both large and small were forced into bankruptcy due to pricing issues, and then we had COVID-19 which basically made coal impossible to sell due to the shutdown of a large portion of the world economy." (*Id.* at 4-5). But ACC cites no case law demonstrating that these circumstances excuse its performance here, and existing case law does not consider profits when assessing whether coal is mineable or merchantable. Even if market conditions were considered in this inquiry, COVID-19 did not slow the economy until March 2020, roughly four years after ACC assumed the lease. Therefore, ACC's argument is not compelling, and the Court finds that ACC explicitly breached this provision of the Lease.[1]

### b. Minimum Royalties and Tax Payments

Next, Big Sandy alleges that ACC breached two portions of the lease by failing to make required payments: § 4.7, requiring deficiency payments in the amount of

---

[1] Big Sandy provides additional arguments as to how ACC breached this provision of the lease: ACC did not use the alternative dispute procedure delineated in the lease for disputing the mineability and merchantability of the Demised Coal and ACC's claims about the mineability and merchantability of the Demised Coal are inconsistent with representations made in bankruptcy court. (Doc. # 46 at 14-16). ACC does not address the alternative dispute procedure argument in its Response, but disagrees that it waived any defenses in Bankruptcy Court. (Doc. # 49 at 5). Though the Court acknowledges these arguments, the Court can easily determine that ACC breached the portion of the lease requiring it to diligently mine the Demised Coal without addressing these additional arguments.

$1,092,257.23 for 2016-2021, and § 3.16 requiring reimbursement for unmined mineral taxes assessed by the Commonwealth of Kentucky for 2017-2019 in the amount of $9,928.23. (Doc. # 46 at 19-21). There is no dispute that the payments were not made.[2] Instead, ACC argues that its obligation to make these payments was waived while the parties negotiated a loan to support ACC's efforts to reopen Mine 15. (Doc. # 49 at 6). ACC argues that whether the provision of the lease was modified is an issue of fact that precludes granting summary judgment to Big Sandy. (*Id.*). Specifically, ACC points to the deposition of Mark Jensen, a corporate representative of ACC, to argue that the parties made an agreement that the "payments were not accruing until a production forecast was agreed upon and a loan was made to restart the mine . . . ." (*Id.* at 6) (quoting Doc. # 46-10 at 143). The quotation from Jensen's deposition that ACC relies upon states in full:

> Q:  And Quest/ACC has never terminated the Lease, correct?
>
> A:  We never terminated the lease. We had an agreement with Chauncy that the production forecasts were based . . .on the loan coming in and the minimums are based on the production forecast . . . So there was no need to terminate the lease. The lease did expire but there was never a . . . production forecast that would dictate the minimums. As Chauncey said, we never had an agreement on any of these things . . . in writing.

(Doc. # 46-10 at 143).

Big Sandy argues that it had no formal agreement with ACC to waive these payments, noting that in the deposition cited by ACC, Jensen specifically refers to an oral agreement and concedes that no written agreement was made. (*Id.*). (Doc. # 50 at 6). Big Sandy argues that any modification to the lease terms was required to be made in

---

[2]  Big Sandy notes that a $500 payment towards the tax payments was identified in October 2019. Thus, Big Sandy is only seeking $9,428.23 plus interest on this claim. (Doc. # 46 at 21).

11

writing, both because of a provision in the lease itself at § 8.9, and to comply with the Statute of Frauds. (*Id.*). It should be noted that while ACC includes the failure to reimburse tax payments to Big Sandy in its arguments related to the deficiency payments (Doc. # 49 at 7), ACC does not cite any document that indicates the tax payments were to be included in these discussions. *See Celotex Corp.*, 477 U.S. at 32 ("To avoid the entry of summary judgment, the non-moving party must produce "specific facts" showing a "genuine issue" necessitating the matter moving forward to trial.").

### i. Section 8.9 of the Lease

While clauses in a contract prohibiting modification of the contract except in writing are generally "valid and binding upon the parties," Kentucky has found that this requirement "may be excused where there has been a modification, waiver, or abrogation thereof, written or oral, or where the general contractor is estopped to rely upon it." *Wehr Constructors, Inc. v. Steel Fabricators, Inc.*, 769 S.W.2d 51, 53 (Ky. App. 1988). But generally speaking, "there must be some sort of consideration or other validating doctrine . . . for an oral modification of a written agreement to be valid." *Marshall v. Labor Works-Cincinnati, LLC*, 2009 WL 106766635, at *2 (E.D. Ky. Aug. 7, 2009) (quoting *Wallace v. Cook*, 227 S.W. 279, 280-81 (Ky. App. 1921)). Further, the proof to support such an assertion must be clear and convincing. *Id.* (quoting *Dalton v. Mullins*, 293 S.W.2d 470, 475 (Ky. 1956)). ACC does not point to clear and convincing proof of such here. ACC uses Jensen's deposition as evidence of an oral agreement that the minimum royalties "were not accruing" until a production forecast was agreed upon and a loan was made to restart the mine. (Doc. # 49 at 6) (citing Doc. # 46-10 at 143). But Jensen's deposition does not say there was an oral agreement to pause the accrual of the deficiency or tax

12

payments—Jensen states in his deposition that there was an oral agreement that "the production forecasts were based . . . on the loan coming in and the minimums [were] based on the production forecast." (Doc. # 46-10 at 143). ACC does not make clear what effect this has on provision § 4.7 of the lease, which required deficiency payments "[i]f the total of Production Royalties payable by [ACC] . . . is less than the Minimum Annual Royalty for that year." (Doc. # 46-4 at 49). Put another way, even if the parties had orally modified their lease by agreeing to calculate the minimums in a different manner, ACC does not explain in its Response how that would also modify ACC's obligation to make the deficiency and tax payments.

### ii. Statute of Frauds

Even if this oral modification somehow affected ACC's obligation to make the deficiency and tax payments, the agreement is not valid because it does not comply with the Statute of Frauds. In Kentucky, the Statute of Frauds requires contracts to be in writing "[u]pon any contract for the sale of real estate, or any lease thereof for longer than one year." K.R.S. § 371.010. The Statute of Frauds applies here because a coal lease is considered an interest in real estate. *Appleby v. Buck*, 351 S.W.2d 494 (1961). In addition to requiring leases for longer than one year to be in writing, the Statute of Frauds also requires that modification of a lease be in writing and contain all the essential elements of the contract. *Gunderson v. Friden, Inc.*, 372 F.2d 303 (6th Cir. 1967).

ACC cites to the Restatement of Contracts and *Seminary Woods, LLC v. Brown* to argue that an oral agreement to modify the contract can serve as a waiver that would excuse ACC's performance. (Doc. # 49 at 6-7) (quoting Restatement (Second) of Contracts § 150 (1981); *Seminary Woods, LLC v. Brown*, No. 2009-CA-1769-MR, 2011

WL 1196466, at *3 (Ky. Ct. App. Apr. 1, 2011)). *Seminary Woods* is the only case cited by ACC in its entire Response, and as noted by Big Sandy, the case does not stand for the proposition that ACC suggests. Instead, this case explains that Kentucky has not adopted § 150 of the Restatement. *Seminary Woods*, 2011 WL 1196466, at *3. The court limited the application of the doctrine of waiver, likening the circumstances to Kentucky Supreme Court precedent that stated the doctrine of equitable estoppel should be "applied cautiously, with due regard to the legislature's enactment of the Statute of Frauds." *Seminary Woods*, 2011 WL 1196466, at *3 (quoting *Farmer's Bank & Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 10 (Ky. 2005)). Further, the court considered that even if the doctrine of waiver applied, the plaintiff did not allege circumstances that would justify a waiver of its obligation to perform under the contract. *Id.* Though the court accepted the plaintiff's assertion that the defendant orally stated his intention to close the deal "at some point in the future," the plaintiff did not allege it altered its position in reliance on those statements, or that the defendant received a benefit due to the delay. *Id.* at *4. As a result, the court could not find that the continued negotiations "were sufficient to establish an enforceable waiver of the writing requirement of the Statute of Frauds." *Id.*

Likewise, ACC does not allege that it altered its position in reliance on the statements to adjust the calculation of the royalty payments, or that Big Sandy received a benefit when the deficiency payments were not made. It also would not have been reasonable for ACC to do so—Jensen acknowledged in the deposition that no written agreement ever materialized (Doc. # 46-10 at 143), and though the March 7, 2017 email

14

describes Big Sandy's willingness to discuss re-structuring the minimum royalty payments, the e-mail does not indicate any sort of final agreement. (Doc. # 46-16).

In a last ditch effort to save its claim, ACC points out that Big Sandy had similar agreements with previous lessees to forgive the accrual of the minimum royalties and tax payments. (Doc. # 49 at 6-7). It is unclear how this is applicable to ACC's lease with Big Sandy, especially because the lease contains a non-waiver provision stating that the failure of Big Sandy to exercise any of its rights upon the nonperformance of the lessee "shall not be construed as a waiver thereof, nor shall the acceptance by [Big Sandy] of such nonperformance . . . be construed as a waiver of the rights . . . as to any subsequent such Default[.]" (Doc. # 46-4 at § 7.5). ACC agreed to this provision when it assumed the lease, and it is not a defense to its breach of contract that Big Sandy chose not to pursue remedies against the prior leaseholders, both of which declared bankruptcy and are irrelevant to ACC's performance here.

Equally irrelevant are ACC's statements that following its assumption of the lease, "there were no cure claims required to be paid by [ACC], meaning that nothing was owed by Fortress to the [Big Sandy] at the time of the lease assignment." (Doc. # 48 at 2). Big Sandy is not pursuing the amounts owed by the prior lessees in this action, and the amounts it alleges that ACC owes for breach of contract accrued following the assumption of the Lease in 2016. (Doc. # 50 at 10). For these reasons, the Court finds that ACC has breached both § 3.16 and § 4.7 of the Lease, and Big Sandy is entitled to summary judgment on these two claims.

### D. Damages

As both parties note, there is a dispute of material fact that precludes summary judgment on Big Sandy's breach of contract with respect to damages on the diligent mining claim. (Doc. # 46 at 22; Doc. # 49 at 5). Thus, the matter of damages will be resolved by subsequent proceedings and no judgment in favor of Big Sandy will be entered until the resolution of the Plaintiff's claim for damages.

### E. Motion to Exclude Expert Testimony

Finally, pending with the Court is Big Sandy's Motion to Exclude the Expert Testimony of Bill Johnson. (Doc. # 47). Big Sandy argues that Johnson's testimony should be excluded because (1) his primary opinion on whether the Demised Coal was mineable or merchantable is irrelevant now that ACC no longer argues whether the Demised Coal ws mineable or merchantable (Doc. # 51 at 1); (2) ACC did not comply with the expert disclosure obligations under Rule 26(a)(2)(B)(ii) by failing to disclose what information he relied upon in making his opinions (Doc. # 47 at 1-2); and (3) Johnson's testimony is irrelevant and unreliable because he uses the wrong standard to determine whether the coal was mineable or merchantable and does not support any of his claims with facts or data (*id.* at 2). ACC responds that Johnson's opinions are reliable and did not require specific calculations, and it does not matter that ACC did not make the necessary disclosures of the underlying data relied upon by Johnson because Big Sandy did not disclose the underlying data from its expert witness, and "never sought to compel Johnson or the Defendant to provide any additional information." (Doc. # 48 at 4-5).

The Court has considered the Motion and positions of the parties. Given that the opinions offered by Johnson were not part of the summary judgment analysis, that would

16

be reason enough for the Court to grant the Motion to Exclude. The only mention of Johnson's testimony in ACC's Response to the Motion for Summary Judgment is where ACC argues there is a material dispute of fact related to damages, which this Court acknowledges and plans to conduct separate proceedings to resolve. ACC states, "The Defendant raised many issues with the calculation of damages as set out in the report of David Newman during his deposition. In addition, the Defendant's expert, Bill Johnson, raises legitimate issues regarding Newman's opinions as to mineability and damage calculation." (Doc. # 49 at 5). However, ACC does not cite to anything specific that Bill Johnson stated in his report to support that statement, and a review of his report indicates that Johnson did not "raise legitimate issues" related to damage calculations. Johnson simply stated that it was his opinion that "none of the coal shown in Newman's calculations [was] mineable and merchantable given coal pricing in 2019 thru 2021 and coal recovery and reject percentage for any proposed mining." (Doc. # 47-5 at 6).

As noted above, ACC conceded that it was not arguing there were any defects with the Demised Coal that made it unmineable or unmerchantable, and profitability is not part of the calculation for whether coal is mineable or merchantable in Kentucky. *See infra* Part II.C.1.a. Thus, Johnson's expert report is not one that would "help the trier of fact to understand the evidence or determine a fact in issue" and can be excluded on this basis. Fed. R. Evid. 702; *see also Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 634 (6th Cir. 1978) ("[w]hether expert testimony will assist the trier is a question for the trial court[.]").

Even if Johnson's report was relied upon in the Court's analysis of the Motion for Summary Judgment (Doc. # 46), it is clear that ACC did not comply with the rules for

17

expert disclosures. In his expert report, Johnson states that in conducting his review, he reviewed the report of Big Sandy's expert, the lease, and "the subject permit(s) and various maps including undergrounds mine maps for the mine(s) in question." (Doc. # 47-5 at 1). However, Johnson stated in his deposition that he reviewed "a ton of stuff" in addition to these items that ACC did not disclose in written discovery, including documents located in a Dropbox and documents from his former employer. (Doc. # 47-3 at 36).

Rule 26 requires a report of a testifying expert to include "a complete statement of all opinions the witness will express and the basis and reasons for them" as well as the "facts or data considered by the witness informing them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). If a party does not provide information as required by Rule 26(a), the party is not allowed to use that information "to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The only justification ACC provides is that Big Sandy did not make similar dislcosures for its expert witness, and Big Sandy never filed a motion to compel the information. (Doc. # 48 at 5).

ACC has not filed any motion to exclude Big Sandy's expert, so the Court will not entertain the argument that ACC's failure to disclose should be excused because Big Sandy made errors too. This is not an argument that ACC's failure to disclose was substantially justified or harmless. Further, ACC cites to no authority, nor has the Court's independent research uncovered any, that requires a plaintiff to file a motion to compel information from expert reports before they can obtain relief in a motion to exclude. Such proposition would run counter to Rules 26(a) and 37(c), as well as Sixth Circuit precedent,

that the exclusion is automatic and mandatory without justification from the party that did not make the proper disclosure. *See Sexton v. Uniroyal Chemical Co., Inc.*, 62 F. App'x 615, 616 n.1 (6th Cir. 2003) (emphasis added); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (6th Cir. 2004) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless.").

For these reasons, Big Sandy's Motion to Exclude the Expert Testimony of Bill Johnson (Doc. # 47) will be **granted**.

### III. CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1) Big Sandy's Motion for Summary Judgment (Doc. # 46) is **GRANTED** on each breach of contract claim;

(2) Big Sandy's Motion to Exclude the Expert Testimony of Bill Johnson (Doc. # 47) is **GRANTED**; and

(2) This matter is **referred** to **Magistrate Judge Edward B. Atkins** for preparation of a Report and Recommendation on the proper amount of damages Plaintiff is entitled to recover as a result of Defendant's breach.

This 16th day of November, 2023.



Signed By:
*David L. Bunning* DB
United States District Judge

K:\DATA\ORDERS\PikeCivil\2021\21-88 MOO on MSJ.docx